**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,

v.

DENNIS A. BRADLEY, JR.

No. 3:21-cr-87 (VAB)

**RULING AND ORDER ON MOTIONS FOR ACQUITTAL AND MOTION FOR NEW TRIAL**

A grand jury indicted Dennis A. Bradley, Jr. ("Defendant") for one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and five counts of wire fraud in violation of 18 U.S.C. § 1343. *See* Superseding Indictment, ECF No. 50 (May 4, 2022) ("Superseding Indictment").

After the Government presented its case-in-chief, on March 24, 2026, Mr. Bradley moved for acquittal. *See* Mot. for Acquittal, ECF No. 360 (Mar. 24, 2026) ("Mot.). Following the Defense's case-in-chief, and after the Court allowed the Government to present one rebuttal witness, on March 25, 2026, Mr. Bradley filed a second motion for judgment of acquittal specific to Counts Three, Four, and Six. Mot. for Acquittal on Counts 3, 4, 6, ECF No. 364 (Mar. 25, 2026) ("Second Mot.").

On March 27, 2026, a jury convicted Mr. Bradley on all six counts of the Superseding Indictment. *See* Jury Verdict, ECF No. 370. On March 30, 2026, Mr. Bradley filed a motion for a new trial and once more moved for a judgment of acquittal on all six Counts. Mot. for Acquittal (Renewed), ECF No, 368 (Mar. 30, 2026) ("Third Mot."); Mot. for New Trial, ECF No. 369 (Mar. 30, 2026) ("Mot. for New Trial").

For the following reasons, Mr. Bradley's motion for acquittal is **GRANTED in part and DENIED in part**, and his motion for a new trial is **DENIED**.

The motion for acquittal is granted with respect to Counts Three, Four, and Six, and denied with respect to Counts One, Two, and Five.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Trial Proceedings

At trial, the Government presented testimony from twelve witnesses, evidence related to the planning of an event at a restaurant, the Dolphin's Cove, evidence from the event, and evidence related to Mr. Bradley's subsequent campaign filings. The Government also presented the following evidence specific to the charged conduct for each count of wire fraud.

#### *1. March 15, 2018 Text Message*

On March 15, 2018 at 3:02 p.m., a text message exchange occurred between Mr. Bradley, Tina Manus, Bieu Tran, and Yvette Retamar (collectively, "Campaign Staff"), in which Ms. Manus asked Mr. Bradley, "Do u want fundraiser forms tonight?" and Mr. Bradley responded, "Yes" and "Bring then [sic] and sign in sheets." Gov. Ex. 116, 1. At 5:45 p.m. that same day, Ms. Retamar responded in the group chat, "?" in response to a text sent by Mr. Tran in the group chat. *Id.* at 7. Ms. Retamar testified that at the time of the text exchange, she was in San Antonio, Texas caring for her ailing grandmother. *See* Trial Transcript 99, ECF No. 390; *see also* Trial Transcript 185, ECF No. 389.

The Government also introduced various text exchanges between the Campaign Staff, occurring from February 21, 2018 to March 11, 2018. Gov. Ex. 101–105, 107A, 113, 114. In one such exchange occurring on February 21, 2018, Mr. Tran asked for "details on roll out party," to which Mr. Bradley responded, "Dolphine [sic] cove March 15." Gov Ex. 101 at 2. Mr. Bradley

described the event as "BDK Law Group night to remember!" *Id.* at 3. In response to Mr. Tran's message asking, "Wouldn't that be illegal", Mr. Bradley messaged "No it's a BDK Law group party." *Id.*

*2. eCRIS Filings*

On April 10, 2018, Mr. Bradley's campaign submitted "Form 30", the itemized campaign finance disclosure statement for the Citizens' Election Program's ("CEP"), the covered date range for which included March 15, 2018, the date of the Dolphin's Cove event. *See* Gov. Ex. 207A. On May 24, 2018, Mr. Bradley's campaign submitted CEP Form 10, the affidavit of intent to abide by expenditure limits and other CEP requirements. *See* Gov. Ex. 209. On August 28, 2018, following the primary election, Mr. Bradley's campaign submitted the primary to general election "carry forward" form. *See* Gov. Ex. 230. The Government also introduced the CEP overview document, Gov. Ex. 203A, and the candidate guidebook, Gov. Ex. 204A, both of which Mr. Bradley's campaign received.

At trial, three witnesses testified about the electronic campaign reporting system ("eCRIS") to which Mr. Bradley submitted the above-mentioned forms. First, the Government called Connecticut State Election Enforcement Commission ("SEEC") clerk Sheri Lyn-Lagueux, who testified that CEP forms submitted by a candidate, whether they are documents filled out by hand or electronically submitted, are stored on SEEC servers. *See* Trial Transcript 53, ECF No. 375. She noted that in 2018, SEEC had multiple servers: a local server in Hartford, a server in Groton, and disaster recovery backup server in Springfield, Massachusetts. *Id.* She testified that, based on her understanding, any data that is uploaded to eCRIS is saved on all three of these servers, and that the process occurs automatically. *Id.* at 54.

Second, Mr. Bradley called Mann Hasen, who served as the IT Director at SEEC from 2008 to 2014 and developed the eCRIS system with his team. *See* Trial Transcript 6, ECF No. 378. Mr. Hasen testified that, at the time eCRIS was developed, submissions to the eCRIS system would travel from "wherever the user is sitting . . . all the way to Hartford", and that once SEEC lost the lease for the data center in East Hartford, it migrated the system to a data center in Groton. *Id.* at 7. Mr. Hasen testified that it is unlikely that any portion of the data would leave the state of Connecticut during the transmission process, but that there was a nightly backup of information to the disaster recovery center in Springfield, Massachusetts. *Id.* at 7-9. He also testified that the backup process to the server in Massachusetts was not triggered by a candidate's submission to eCRIS, but was a process separate from the transmission that occurs when a candidate submits a filing through eCRIS. *Id.* at 9-10. On cross-examination, Mr. Hasen testified that he was not employed by SEEC in 2016 when it first developed the disaster recovery process in Massachusetts, nor in 2018, when Mr. Bradley made the submissions to eCRIS. *Id.* at 19. On redirect, Mr. Hasen testified that when he returned to SEEC in 2024, he was able to review and understand the eCRIS process. *Id.* at 33.

Third, on rebuttal, the Government called Richard Bramandi, a software developer who was hired by SEEC to help develop the eCRIS system. *Id.* at 74. He testified that in 2018, SEEC was running a disaster recovery program that replicated any activity occurring on the Groton server to a server in Springfield, Massachusetts. *Id.* at 74-75. He testified that "the server saves [eCRIS filings] to the database in Groton. Behind the scenes, the VMware process is just always running, and when it sees that there was a change made, it automatically replicates it to a mirror in Springfield." *Id.* at 76. On cross-examination, Mr. Bramandi confirmed that once a user

submits data to eCRIS, it is saved to SEEC's server in Groton, and SEEC's VMware process then replicates that data to the Massachusetts server "for protection." *Id.* at 92.[1]

*August 21, 2018 E-mail*

On June 29, 2018, SEEC received a complaint claiming that the Dolphin's Cove event was an undisclosed campaign event for Mr. Bradley's campaign for state senate. *See* Gov. Ex. 304; Trial Transcript 125, ECF No. 376. On August 21, 2018, an SEEC investigator assigned to the matter received an e-mail from the address "mark@bdklawgroup.com" and copying "dennis@bdklawgroup.com." The e-mail read:

> Good morning Investigator Vazquez,
>
> I hope this email finds you well. I'm attaching a copy of the answer that was mailed to your office today. I look forward to a quick resolution in this matter.
> If you have any questions or concerns, please do not hesitate to contact me.
>
> Dennis Bradley
> Candidate for State Senator

[11] Because the defense objected to the Government calling Mr. Bramandi as a rebuttal witness, arguing that he could and should have been called in the Government's case-in-chief, the Court had the Government present Mr. Bramandi's expected testimony in a proffer session, outside of the presence of the jury. During Mr. Bramandi's proffer testimony, the Court asked, "it happens quickly, but effectively is a two-part process, correct?" to which Mr. Bramandi responded "Yes, it is a two-part process." *Id.* at 59-60.

Gov. Ex. 306. Attached to the e-mail was a letter signed by Mr. Bradley, which was also mailed to the SEEC and listed Mr. Bradley's law firm as the return address. *See* Gov. Ex. 307. The letter stated:

> On March 15, 2018, BDK hosted a client appreciation event at Dolphin's Cove restaurant. I did take the opportunity when thanking our clients to make my announcement that I intended to seek election for the State Senate office of the 23rd District. This was in no shape or form a political event. The event was listed on my Bradley for Bridgeport Facebook page as a means of promoting the BDK event. Attached is a copy of the flyer that was used to promote this event. Nowhere does it mention anything in regard to the State Senate election. In fact, we did not collect any donations at this event and have no donations dated 3/15/2018.

*Id.* at 1; *see also* Trial Transcript 123-131, ECF No. 376.

At trial, the Government called Cory Gaddis, a records custodian at Google. Mr. Gaddis testified that Google hosted the e-mail domain "bdklawgroup.com" when the above-mentioned email was sent to the SEEC, and that all e-mail activity for a Google-hosted domain routes through Google's data centers. *See* Trial Transcript 103-105, ECF No. 389. Mr. Gaddis testified that on August 21, 2018, the date on which the above-mentioned e-mail was sent, there were no Google data centers in Connecticut, and any e-mail sent by someone in Connecticut to a recipient also in Connecticut would necessarily travel through one of Google's data centers located outside of the state. *Id.* at 109. On re-cross, Mr. Gaddis clarified that the address listed in the "from" category of an e-mail exchange is the sender, the address listed in the "to" category is the recipient, and any address listed in the "cc" category receives a copy of the email. *Id.* at 120.

### B. Procedural History

On May 24, 2021, a grand jury returned an indictment against Mr. Bradley charging him with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and five

counts of wire fraud in violation of 18 U.S.C. § 1343.[2] *See* Indictment, ECF No. 1. On May 4, 2022, a grand jury returned a superseding indictment charging Mr. Bradley with the same. *See* Superseding Indictment.

On March 16, 2026, jury selection took place, following years of pre-trial motion practice, including an interlocutory appeal to the United States Court of Appeals for the Second Circuit. Min. Entry, ECF No. 346 (Mar. 16, 2026). Trial began on March 17, 2026. Min. Entry, ECF No. 348 (Mar. 17, 2026).

On March 24, 2026, the Government rested. Min. Entry, ECF No. 358 (Mar. 24, 2026). The same day, Mr. Bradley moved for a judgment of acquittal. *See* Mot. for Acquittal, ECF No. 360 (Mar. 24, 2026) ("Mot.).

On March 25, 2026, the defense rested, Min. Entry, ECF No. 362 (Mar. 25, 2026), and the Government called one rebuttal witness, *id.* Following the Government's rebuttal witness, Mr. Bradley filed a second motion for judgment of acquittal specific to Counts Three, Four, and Six. Mot. for Acquittal on Counts 3, 4, 6, ECF No. 364 (Mar. 25, 2026) ("Second Mot.").

On March 27, 2026, the jury returned a guilty verdict as to all six counts. *See* Jury Verdict, ECF No. 370 (Mar. 27, 2026) ("Verdict"); *see also* Min. Entry, ECF No. 367 (Mar. 27, 2026).

On March 30, 2026, Mr. Bradley filed a motion for a new trial and once more moved for a judgment of acquittal on all six Counts. Mot. for Acquittal (Renewed), ECF No, 368 (Mar. 30, 2026) ("Third Mot."); Mot. for New Trial, ECF No. 369 (Mar. 30, 2026) ("Mot. for New Trial").

On April 20, 2026, the Government filed a memorandum in opposition to Mr. Bradley's motions for acquittal and his motion for a new trial. Mem. in Opp'n, ECF No. 379 (Apr. 20, 2026) ("Opp'n").

---

[2] The Indictment also charged Ms. Jessica Martinez, whose case was severed from Mr. Bradley's on April 4, 2025. *See* Order Granting Mot. to Continue and Mot. to Sever, ECF No. 278.

On June 23, 2026, Mr. Bradley filed a reply to the Government's memorandum in opposition. Reply, ECF No. 396 (Jun. 23, 2026) ("Reply").

On September 2, 2026, the Court held a hearing on the pending motions for acquittal and new trial. ECF No. 398.

## II. STANDARD OF REVIEW

### A. Motion for Acquittal

When reviewing a motion for judgment of acquittal, courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (alteration and internal quotation marks omitted) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). A defendant challenging the sufficiency of the evidence thus "bears a heavy burden." *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks omitted).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). A court must "defer to the jury[ the] assessment of witness credibility and . . . resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir.

2000). In sum, "[t]he government's case need not exclude every possible hypothesis of innocence," *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir. 1995) (internal quotation marks omitted), and where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter," *Guadagna*, 183 F.3d at 129 (internal citation and quotation marks omitted) (alteration in original).

At the same time, the court must be mindful of its responsibility to protect the defendants' Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

### B. Motion for a New Trial

Federal Rule of Criminal Procedure 33 allows the court to "grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. Under Rule 33, the trial court has "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In deciding such a motion, courts may weigh the evidence and the credibility of witnesses but cannot "wholly usurp" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir.

2000). As a result, the power to set aside a jury verdict "should be used 'sparingly' and only 'in the most extraordinary circumstances.'" *United States v. Zayac*, No. 3:09–cr–00136 (JCH), 2011 WL 5238823, at *2 (D. Conn. Nov. 1, 2011) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

The court also "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice." *Id.* To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. The Motion for Acquittal

Under 18 U.S.C. § 1343,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Mr. Bradley moves for a judgment of acquittal on Counts Two, Three, Four, Five, and Six, which charged him with wire fraud in violation of 18 U.S.C. § 1343, as well as Count One, which charged him with conspiracy to commit wire fraud under 18 U.S.C. § 1349. *See* Verdict.

The Court addresses each Count in turn.

#### i. Count One

Count One charged Mr. Bradley with conspiracy to commit wire fraud. And, as Mr. Bradley acknowledges, "[t]o sustain a conspiracy conviction, the Government must present

evidence from which can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." Third Motion at 18-19 (citation omitted).

Mr. Bradley argues that the "government has proven neither that the charged communications actually crossed state lines nor that Bradley or any alleged co-conspirator knew or believe that any interstate wire would follow from their conduct . . . ." *Id.* at 19.

In response, the Government argues that "nothing about the conspiracy count depended on proof of the interstate wires charged in the wire fraud counts." Mem. in Opp'n at 33. The Government then argues that "there was extensive evidence that Bradley entered into a corrupt agreement to defraud SEEC." *Id.*

The Court agrees.

As the Court instructed the jury, "[b]ecause conspiracy is a separate offense from the substantive offense of wire fraud . . . the Government need not prove that Mr. Bradley actually committed wire fraud in order to have conspired to commit wire fraud. Instead, the Government must prove beyond a reasonable doubt the elements of a conspiracy to commit wire fraud . . . ." Trial Transcript 31, ECF No. 395. Mr. Bradley has not pointed to any case law suggesting that this jury instruction was legally erroneous.

At best, his argument raises the issue of whether the evidence was sufficient to convict him. But this Court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Heras*, 609 F.3d at 105(citation and internal quotation marks omitted), and it also must "defer to the jury[ the] assessment of witness credibility and . . . resolution of conflicting testimony." *Bala*, 236 F.3d at 93–94. As a result, this argument fails.

Accordingly, Mr. Bradley's motion for a judgment of acquittal on Count One will be denied.

ii. Count Two

Count Two charged Mr. Bradley with wire fraud with respect to his March 15, 2018 text message to the Campaign Staff instructing Ms. Manus to bring contribution cards to the Dolphin's Cove event occurring that same day. *See* Superseding Indictment at 22. Mr. Bradley argues that the conviction on Count Two cannot stand for two reasons: the charged text message was not an interstate transmission and the text message was not in furtherance of the alleged scheme.

With respect to the first reason, he makes five arguments. First, he argues that Ms. Retamar's response in the group chat, which "[had] nothing to do with fundraiser forms, SEEC, or the alleged fraud," cannot be used to establish the interstate element. Third Mot. at 6. Second, he argues that the Government failed to prove that the messages from Mr. Bradley, which are the charged wires, crossed state lines. *Id.* at 7. Third, he argues that the Government provided "no delivery receipt, no transmission confirmation, and no technical data establishing that the [charged wires] were simultaneously routed to [Ms. Retamar's] device." *Id.* Fourth, he argues that the Government "introduced no carrier records for this specific transmission." *Id.* Fifth, he argues that Ms. Retamar's message was not a "core component" of the wire fraud scheme, and that Congress never intended to "federalize every intrastate text sent in any group thread containing a single out-of-state contact." *Id.* at 7-8.

With respect to the second reason, he argues that asking Ms. Manus to bring contribution forms to the event was not "inherently fraudulent," particularly since Ms. Manus testified that Mr. Bradley told her "[n]o money tonight" and she altered the contribution forms without his

authorization. Third Mot. at 14; Trial Transcript 76, ECF No. 391. He also argues that the text exchange lacked the necessary nexus to the scheme, since the text exchange occurred before Mr. Bradley declared his candidacy and was not directed towards the SEEC. Third Mot. at 14.

The Government responds that because Ms. Retamar testified that she was in San Antonio, Texas when Mr. Bradley sent, and she read, the charged wire, there was sufficient evidence for a rational juror to find beyond a reasonable doubt that Mr. Bradley's text message constituted an interstate wire. Mem. in Opp'n at 5-6. Next, the Government argues that since testimonial evidence is a valid method by which to establish the interstate element, technical data is not necessary. *Id.* at 6. The Government also argues that Ms. Retamar's response in the group chat "was offered to corroborate her testimony that she actually received the text message charged in Count Two while she was in Texas," and was not the charged wire relevant to Count Two. *Id.*

In response to Mr. Bradley's argument that the text message was not in furtherance of the alleged scheme, the Government argues that the evidence presented at trial was "sufficient for the jury to find that [Mr. Bradley's] text message to [Ms. Manus] was 'incident to an essential part of the scheme, … or a step in the plot,' even if the message itself 'contained no false information.'" *Id.* (citing *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (cleaned up)). The Government further argues that under the law in this Circuit, the charged wire does not need to be a fraudulent representation that has a nexus to the alleged deception of the victim, nor does it need to be a "core component" of the scheme. *Id.* at 9-10 (citing *Reifler*, 446 F.3d at 95 and *United States v. Kim*, 246 F.3d 186, 190 (2d Cir. 2001)).[3]

The Court agrees.

[3] In his Reply, Mr. Bradley makes no new arguments in response to the Government's memorandum in opposition.

In order to satisfy the interstate requirement of a wire fraud charge, the charged wire must have traveled between states. *See Cofacredit S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999) ("The wire fraud statute requires that the defendant communicate by wire in 'interstate or foreign commerce' in furtherance of a scheme to defraud.") (quoting 18 U.S.C. § 1343)). Ms. Retamar testified that when Mr. Bradley sent the charged wire from Connecticut, she read and responded to it while she was physically in Texas. As a matter of law, this testimony, without more, can establish that a charged wire traveled interstate. *See United States v. Zayac*, 765 F.3d 112, 117-18 (2d Cir. 2014) ("'[T]he jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence.'") (quoting *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)); *United States v. Kim*, 246 F.3d 186, 189-91 (2d Cir. 2001) (finding venue in the Southern District of New York where wires were "sent to and by Chase Manhattan bank," which was "headquartered in New York," without any discussion of where bank's servers or technological infrastructure were housed); *United States v. Tuzman*, No. 15 CR. 536 (PGG), 2021 WL 1738530, at *23 (S.D.N.Y. May 3, 2021), *aff'd,* No. 21-2229, 2024 WL 1173044 (2d Cir. Mar. 19, 2024) ("While Amanat argued to the jury that the Government's evidence of interstate wires was lacking, a 'verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable.'") (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005)); *see also United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007) ("[W]ire fraud ... can be proved by circumstantial evidence.").

As to Ms. Retamar's credibility and the sufficiency of her testimony to establish the fact of her presence in Texas, that is a question reserved for the jury. *See United States v. Casamento*,

887 F.2d 1141, 1156 (2d Cir. 1989) ("It is the role of a jury to draw reasonable inferences or conclusions from facts which the jury determines the evidence establishes."); *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) ("As it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence, when there are such competing inferences, we must defer to the jury's choice[.]" (internal citation and quotation marks omitted)).

In order to satisfy the "in furtherance" requirement of the wire fraud statute, the charged wire "need not be an essential element of the scheme; rather, it is sufficient if that transmission was *incident to* an essential part of the scheme, or a step in the plot." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (cleaned up) (emphasis in original). "Nor need the wire communication itself have been false; even innocent transmissions, *i.e.,* ones that contain no false information—may supply the transmission element." *Id.* (cleaned up).

The Government presented sufficient evidence for a reasonable jury to infer that Mr. Bradley's text instructing Ms. Manus to bring contribution forms to the Dolphin's Cove event was, at least, incident to an essential part of Mr. Bradley's scheme to conceal the nature of the event and the related expenses. *See* Gov Exs. 119A–H (contribution forms collected at the event); Gov. Exs. 100, 110A, 110B, 110C, 111A, 111C, 115A, 115B, 132A, 132D, 132E (business records and testimony that Mr. Bradley's personal expenses for the event exceeded $2000); Gov. Exs. 125, 126, 129, 130 (text messages between Mr. Bradley and his campaign staff discussing the contributions collected on the night of the event); Gov. Exs. 207A–D (submissions to SEEC containing the altered contribution dates); Gov. Ex. 307 (letter to the SEEC signed by Mr. Bradley stating, unambiguously, that he "did not collect any donations at [the Dolphin's Cove] event and have no donations dated 3/15/2018.").

Accordingly, Mr. Bradley's motion for a judgment of acquittal on Count Two will be denied.

iii. Counts Three, Four, and Six

Counts Three, Four, and Six charged Mr. Bradley with wire fraud with respect to his eCRIS filings related to his campaign finances and eligibility for CEP grants. *See* Superseding Indictment at 22. First, Mr. Bradley argues that acquittal is warranted on these Counts because the Government failed to establish that eCRIS transmissions occur interstate. Mr. Bradley argues that Ms. Lagueux, Mr. Bramandi, and Mr. Hasen, all confirmed that the transmission of files to eCRIS occurs entirely within the State of Connecticut, Second Mot. at 3, and that the replication to the server in Massachusetts is "[a]n automatic, server-side backup that occurs after an eCRIS filing has already been submitted to and received by SEEC in Connecticut." Mot at 5. Second, even if the replication to the Massachusetts server was a wire communication within the meaning of the wire fraud statute, Mr. Bradley argues that it still cannot satisfy the elements of the crime because the replication process is uninitiated, uncontrolled, invisible, and unknown to the user, and therefore is not a transmission done for the purpose of executing the alleged scheme. Second Mot. at 6-7.

The Government responds that "because posting documents on eCRIS was mandatory and thus necessary to obtain the CEP grants, and because eCRIS postings involved a transmission to Massachusetts, the use of those interstate wires was likewise a necessary part of Bradley's efforts." Mem. in Opp'n at 13-14. The Government argues that Mr. Bradley mischaracterizes the charged wire in the relevant Counts, which is not the "filing", but rather "the document 'electronically *posted* on eCRIS,' which involved transmission to servers in Groton and Springfield." *Id.* at 17 (emphasis in original).

Next, the Government argues that the cases Mr. Bradley cites do not support his argument, since they all concern situations in which the defendant gained possession of the object of the fraud before the charged wire occurred. *Id.* at 17-18. The Government also relies on the Second Circuit's decision in *United States v. Slevin*, 106 F.3d 1086 (2d Cir. 1996) to argue that the wire fraud statute encompasses mailings that "come after a particular fraud but [may] still be in furtherance of the overall scheme." Mem. in Opp'n at 18. "Thus," the Government argues, "even if posting a document on eCRIS involved a transmission from Groton to Springfield after the initial transfer to Groton, that subsequent transfer was still a necessary part of maintaining the overall relationship between the Bradley campaign and SEEC, which required the continued use of eCRIS (and all its servers) in order to obtain CEP grants." *Id.*

With respect to Mr. Bradley's second argument, the Government first argues that "'a defendant need not specifically intend the use of this or that wire,' so long as 'he acts with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen.'" *Id.* at 18-19 (internal citations omitted). Next, the Government argues that Mr. Bradley knew that his campaign was required to use the online filing program, and he therefore "ceded control over what eCRIS did with that document in order to carry out its functions, including its use of interstate wires." *Id.* at 19.

Mr. Bradley replies that the Government's own rebuttal witness, Richard Bramandi, confirmed that the primary eCRIS transmission occurs intrastate, and that the replication to the Massachusetts server is a sequential and two-part process. Reply at 8-9. He argues that Mr. Bramandi's testimony revealed that the mirroring process does not transmit the document itself to Massachusetts, but rather replicates the Groton server's entire environment as contingency in the case of an infrastructure disaster, and therefore does not constitute a transmission in

furtherance of the scheme. *Id.* at 10. Mr. Bradley also argues that *Slevin* does not apply here because:

> *Slevin* involved reimbursement checks mailed by contract obligees to contractors— communications that were essential to preserving the defendant's continuing relationship with the very contractors whose repeat business sustained his fraudulent bonding enterprise. The court held those mailings were in furtherance of the scheme only because the defendant had a direct, active interest in their occurrence: without reimbursement, contractors would stop purchasing bonds from him.

*Id.* at 13. The replication process, he argues, is distinct, since Mr. Bradley had no continued interest in whether the replication occurred, and the backup does not sustain an ongoing enterprise. *Id.*

The Court agrees.

In order to commit wire fraud, a defendant must use interstate wires "in furtherance of" the scheme to defraud. *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires."); *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) ("The mail and wire fraud statutes prohibit the use of both means of transmission in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" (quoting 18 U.S.C. § 1343)).

A transmission is in furtherance of a scheme to defraud if it is "a part of the execution of the fraud," *Kann v. United States*, 323 U.S. 88, 95, or "incident to an essential part of the scheme," *Pereira v. United States*, 347 U.S. 1, 8. The Supreme Court has interpreted the "in furtherance" requirement of the analogous mail fraud statute to exclude subsequent transmissions

where the alleged fraud had already been completed, *see Kann*, 323 U.S. 88 ("The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."), and to include such transmissions that "were part of the execution as conceived by the perpetrator at the time," *Schmuck v. United States*, 489 U.S. 705, 715 (1989); *see also United States v. Lane*, 474 U.S. 438, 451–52 (1986) ("Mailings occurring after receipt of the goods obtained by fraud are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" (*quoting United States v. Maze*, 414 U.S. 395 (1974))). Ultimately, the "question is whether [the charged acts] were sufficiently closely related to [the defendant's] scheme to bring his conduct within the statute." *Maze*, 414 U.S. at 399.

Here, Mr. Bradley is charged with a scheme of submitting falsified campaign finance records and grant applications to the eCRIS system in order to defraud SEEC of CEP grants for his primary and general election campaigns. The Government's rebuttal witness, Mr. Bramandi, established that submissions to the eCRIS system are first stored on a server in Groton, Connecticut, after which a software called VMware replicates the Groton server's environment to a backup disaster recovery server in Springfield, Massachusetts. *See* Trial Testimony 74-75, ECF No. 378 (stating that SEEC's principal server is in Groton, and "anything that happens to our servers [in Groton] gets immediately replicated to the Springfield servers" by VMware). The relevant inquiry "is whether [the replication to the Massachusetts server] [was] sufficiently closely related to [the defendant's] scheme to bring his conduct within the statute." *Maze*, 414 U.S. at 399.

Mr. Bramandi testified that VMware's replication to the servers in Springfield, Massachusetts, is a separate, albeit instantaneous, process that does not impact the substance of the original transmission nor alter SEEC's receipt of the transmitted information. *See* Trial Testimony 76, ECF No. 378 ("So the server saves it to the database in Groton. Behind the scenes, the VMware process is just always running, and when it sees that there was a change made, it automatically replicates it to a mirror in Springfield"); *id.* at 59 (When a user submits to eCRIS, "[i]t goes to, in our case, the data, our database in Groton. It goes to that database, and then this other process that is sitting there in our VMware, like, overlooking all of the computers on the hardware syncs it to the other hardware . . . it is a two-part process"); *id.* at 60 ("It definitely goes into [the Groton] database first.").

Thus, the replication to the Springfield server was not "necessary" to the success of Mr. Bradley's submissions to SEEC. *Cf. Schmuck*, 489 U.S. at 712 ("Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."); *United States v. Altman*, 48 F.3d 96, 103 (2d Cir. 1995) ("A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition. Obviously, such a mailing cannot be considered even as incident to an essential part of the scheme."). Once Mr. Bradley submitted the forms to eCRIS and the forms had been received and stored on the Groton server, both the fact and place of the server's replication to Springfield, Massachusetts was irrelevant to Mr. Bradley's scheme to defraud. *Cf. Kann*, 323 U.S. at 94 (finding that "how the bank which paid or credited the check would collect from the drawee bank" was "immaterial . . . to any consummation of the scheme, as the statute requires").

In fact, the Government provided no testimony or any other evidence to suggest that without the replication, the scheme would be incomplete, that the replication in any way aided Mr. Bradley in executing his scheme, or that the replication had any effect on Mr. Bradley's scheme whatsoever. *See Maze*, 414 U.S. at 402 ("[T]here is no indication that the success of his scheme depended in any way on" the charged use of the mails). Indeed, Mr. Bramandi testified that the purpose of the replication process was not to facilitate the functionality of eCRIS, but rather to create a contingency in the case of system failure. *See* Trial Testimony 74-75, ECF No. 378 (detailing that the purpose of VMware is to "set up a mirror site for disaster recovery . . . the way that works, if we have a problem, we can immediately switch over from our data center to the Springfield data center").

Thus, the replication to the Springfield server cannot be transmitted "for the purpose of executing the fraud." *Kann*, 414 U.S. at 95. Nor is the replication process "incident to" the scheme to defraud. *Cf. Pereira*, 347 U.S. 1, 8 ("When Pereira delivered the check, drawn on an out-of-state bank, to the El Paso bank, he "caused" it to be transported in interstate commerce. It is common knowledge that such checks must be sent to the drawee bank for collection, and it follows that Pereira intended the El Paso bank to send this check across state lines.").

It is not enough that the replication process occurs automatically. Rather, the replication must play some role in the success of the scheme. *See Schmuck*, 489 U.S. at 714 (finding that subsequent mailings was incident to an essential part of the scheme because it avoided jeopardizing the "relationship of trust and good will" necessary to the scheme's fruition); *see United States v. Bortnovsky,* 879 F.2d 30, 40 (2d Cir. 1989) (act was incident to "the business of processing a claim or transaction"); *United States v. Thaler*, 229 F. App'x 7, 10 (2d Cir. 2007) (finding that the defendant's use of the wires was incident to an essential part of the scheme to

defraud where the defendant "could not afford to have the lender bear the loss of his fraudulent loan applications" because "such a loss might have put the loan officer's employment in jeopardy, which, in turn, might have impaired his ability to procure fraudulent loans from the lender for his buyers"); *United States v. Martin*, 411 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (finding that in a scheme to defraud consisting of giving racehorses performance-enhancing drugs and then placing bets on those horses, using wires to place the bets was incident to scheme's profitability); *Yien-Koo King v. Wang*, No. 14-CV-7694 (LJL), 2020 WL 6875403, at *21 (S.D.N.Y. Nov. 23, 2020) ("The wires were 'incident to an essential' part of the scheme. If the funds had not been wired to the Estate, the Estate either would not have released the artwork, or having released it, would have tried to retrieve it.").

And while it is true that post-fraud transmissions may nonetheless further a scheme to defraud, see *Slevin*, 106 F.3d at 1089–90 ("[P]ostfraud mailing of invoices, checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised, or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant." (internal citations omitted)), the replication to the Massachusetts server here played no such role. It was neither part of nor incident to the scheme to defraud; it was merely a collateral process that does not fall within the scope of the wire fraud statute. *Cf. Maze*, 414 U.S. at 405 ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be for the purpose of executing such scheme or artifice . . . .") (footnote omitted); *see id.* at 405 n.10 ("If the Federal Government is to engage in combat against fraudulent schemes not covered by the statute, it must do so at the initiative of Congress and not of this Court.").

As a result, viewing the evidence in the light most favorable to the prosecution, no rational juror could have found beyond a reasonable doubt that the replication of the Connecticut server environment to the servers in Massachusetts was a use of the wires in furtherance of Mr. Bradley's scheme to defraud, and the Government is unable to establish the interstate element of wire fraud on these counts. *See Valle*, 807 F.3d at 513 ("If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." (quoting *Lorenzo*, 534 F.3d at 159).

Accordingly, Mr. Bradley's motion for judgment of acquittal on Counts Three, Four, and Six will be granted.

iv. Count Five

Count Five charged Mr. Bradley with wire fraud for the August 21, 2018 e-mail sent to SEEC in response to the complaint it received regarding the Dolphin's Cove event. *See* Superseding Indictment at 22. Mr. Bradley argues that acquittal is required for five reasons. First, Mr. Bradley argues that the email was sent by Mark Bradley, not Dennis Bradley, and the Government introduced "no evidence that Dennis Bradley asked Mark Bradley to send it, directed its contents, knew in advance it would be sent, or took any action that caused it to be transmitted." Third Mot. at 10. Second, he argues that "[r]eceiving a copy of someone else's email is not using a wire," nor is it "causing a wire." Id. Third, he argues that "the attached letter bears a signature that does not match Dennis Bradley's genuine signature" and the Government "called no handwriting expert and offered no testimony identifying the signature as [Mr. Bradley's]." *Id.* Fourth, he argues that the e-mail is not in furtherance of any scheme because "[a] person concealing a fraud does not copy himself on a letter to the investigating agency and

invite questions. Exhibit 306 is nothing more than consciousness of innocence." *Id.* at 11. Fifth, Mr. Bradley argues that the Government did not establish the interstate element because it did "not establish that this specific email was routed through out-of-state infrastructure." *Id.*

The Government responds first that Mr. Gaddis's testimony was sufficient to establish that the e-mail traveled interstate, since "[p]roof that a transmission utilized a service provider with no in-state servers is a commonly accepted method to prove that the transmission moved interstate." Mem. in Opp'n at 21. With respect to Mr. Bradley's remaining arguments stating that he did not send the e-mail or cause it to be sent, the Government argues that the Court lawfully instructed the jury that it was not necessary for Mr. Bradley to have sent the e-mail himself, only that its transmission was reasonably foreseeable in the execution of the scheme. *Id.* at 23. The Government argues that based on the evidence introduced, a rational juror could find, beyond a reasonable doubt, that Mr. Bradley "either sent, knew about, or could have foreseen the email charged in Count Five." *Id.* at 25.

The Court agrees.

With regards to the interstate element of the charged wire in Count Five, "[a] wire communication whose origin and ultimate destination are within a single state can violate the wire fraud statute if it is routed through another state." *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016) (quoting *Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251, 265 (2d Cir. 2004), *rev'd in part on other grounds,* 547 U.S. 451 (2006)). Mr. Gaddis's testimony – that e-mails sent from the Bradleys' Google-hosted domains would have necessarily traveled through one of Google's data centers located outside of the state, since Google had no data centers within the state – is sufficient for a rational juror to find the interstate element had been satisfied beyond a reasonable doubt. *See* Trial Transcript 103-105, 109, ECF No. 389; *United States v. Siembida*,

604 F. Supp. 2d 589, 597 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Price*, 374 F. App'x 189 (2d Cir. 2010) (finding that although sender and receiver of email resided in the same state, testimonial stipulation from Time Warner Cable employee that "any email sent via an 'adelphia.net' email address would have been routed through" out of state server was sufficient to establish interstate element of wire fraud charge); *cf. United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) ("Eric Kinney, from Lending Club's Fraud Operations, testified that, while he could not be certain as to which, the server could have been located in "Nevada, California, Santa Clara" at the time that Bankston filled out the loan application. By contrast, there was no evidence suggesting that the server could have been in Ohio. The government was not obliged to prove the actual location of the Lending Club server, only that Bankston's transaction involved the use of an interstate wire.") (citation omitted). "The requirement that the defendant have been the cause of the wire transmission is also interpreted liberally." *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006). "Where one does an act with knowledge that the use of the [wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the [wires] to be used." *Pereira,* 347 U.S. at 8–9 (construing § 1341). At trial, the Government presented evidence that Mr. Bradley reasonably foresaw the use of the wires. For example, the Government presented the e-mail itself, which read, "I'm attaching a copy of the answer that was mailed to your office today," and was signed "Dennis Bradley Candidate for State Senator," Gov. Ex. 306 at 1, as well as the attached letter which was signed "Attorney Dennis A. Bradley, II", *id.* at 2, and included representations that matched the statements Mr. Bradley later made to SEEC Commissioners, *see* Gov. Ex. 316C.

The Government also introduced the same letter that the SEEC received by U.S. mail just days later, which listed Mr. Bradley's law firm as the return address. Gov. Ex. 307. A rational

juror can conclude, from the totality of the evidence, that Mr. Bradley sent the e-mail or caused that e-mail to be sent. *See United States v. Eisenberg*, 784 F. Supp. 3d 579, 612 (S.D.N.Y. 2025) ("The evidence at trial established that Duncan referred cases to Fast Trak for funding; given that Duncan was cc'd on emails to and from Fast Trak from other members of the conspiracy, such as the email in GX 1101, the government's evidence has certainly established that it was foreseeable to Duncan that interstate email would be used in the execution of the scheme.").

Accordingly, Mr. Bradley's motion for a judgment of acquittal on Count Five will be denied.

v. Fraudulent Intent, and Materiality

Mr. Bradley argues that the Government did not establish his fraudulent intent or the materiality of his misrepresentations. First, he argues that no fraudulent intent was established since Ms. Manus testified that she alone altered the contribution forms after Mr. Bradley told her no money was to be collected at the Dolphin's Cove event, and every government witness in the case testified that they perceived the Dolphin's Cove event to be a law firm party, not a political event. Third Mot. at 11. Second, Mr. Bradley argues that Ms. Lagueux's testimony negated materiality, since she testified that Mr. Bradley cooperated fully and could have resolved the filing discrepancies by amendment and without criminal consequences, and "[w]hen the decisionmaking body's own officer says an amendment would have resolved the matter, that standard [for materiality] is not met." *Id.* at 12.

The Government responds that it has presented "copious evidence at trial to prove that Bradley participated in that scheme with the intent to defraud and that the misrepresented information was important to SEEC's decision-making." Mem. in Opp'n at 26.

The Court agrees.

"Essential to a scheme to defraud is fraudulent intent." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). "Fraudulent intent may be inferred "when the 'necessary result' of the actor's scheme is to injure others." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *D'Amato*, 39 F.3d at 1257). "[D]irect proof of defendant's fraudulent intent," however, "is not necessary. Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). And "[w]hen the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *D'Amato*, 39 F.3d at 1257.

At trial, the Government presented sufficient evidence to support the jury's finding, beyond a reasonable doubt, that Mr. Bradley possessed the requisite intent to carry out a scheme to defraud. For example, the Government's evidence included, but certainly was not limited to, text exchanges between Mr. Bradley and the Campaign Staff who planned the Dolphin's Cove event, which it called a roll out party, Gov. Ex. 101–105, 107A, 113, 114; text messages from Mr. Bradey instructing Ms. Manus to bring contribution forms to Dolphin's Cove, Gov. Ex. 116; business records and testimony from Mr. Karayiannis to support that Mr. Bradley paid for the Dolphin's Cove event with personal funds exceeding the $2000 limit imposed by state campaign finance laws, Gov. Exs. 100, 110A, 110B, 110C, 111A, 111C, 115A, 115B, 132A, 132D, 132E; the CEP overview and the candidate guidebook given to Mr. Bradley stating the eligibility requirements for receipt of CEP grants, Gov. Exs. 203A, 204A; Mr. Bradley's campaign's financial disclosures, bank records, and the submissions made to SEEC by Mr. Bradley and Ms. Martinez omitting the Dolphin's Cove expenses, Gov. Exs. 128B, 134, 207A–D, 214A, 214E, 223, 224, 306, 307, 314A–G, 316A–C, 318–320; a Bradley campaign Facebook post inviting

Democratic Town Committee members to Dolphin's Cove, Gov. Ex. 112; video showing Bradley asking Ms. Haddad to introduce Bridgeport political figures at Dolphin's Cove, Gov. Ex. 120A at 20:02-21:29.

The Government also presented sufficient evidence on the materiality of his representations to the SEEC, since inclusion of the expenses related to the Dolphin's Cove event would have made him ineligible for the CEP grants he sought to receive. *See Kousisis v. United States*, 605 U.S. 114, 131 (2025) ("[A] misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important").

Thus, viewing the evidence in the light most favorable to the Government, any rational juror could have found that the evidence established Mr. Bradley's fraudulent intent, as well as the materiality of his misrepresentations, beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Accordingly, Mr. Bradley's motion for acquittal is denied on these grounds.

**B. The Motion for a New Trial**

Mr. Bradley has also moved for a new trial under Federal Rule of Criminal Procedure 33 based on the grounds raised in his arguments for acquittal above. To grant a motion for a new trial, "[t]here must be a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted). And "the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citing *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). Though when deciding a motion, this Court must be satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134, "courts

generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," only intruding in "exceptional circumstances," such as when "testimony is 'patently incredible or defies physical realities.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

While "[g]enerally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414). The Court has considered the evidence and Mr. Bradley's arguments regarding the interstate elements of the wire fraud schemes and has found that the evidence on Counts Two and Five was sufficient, while the evidence on Counts Three, Four, and Six were insufficient as a matter of law. *See supra*, Section III. As for Mr. Bradley's argument that the evidence on Mr. Bradley's intent in the scheme, as discussed above, the evidence presented was legally sufficient for the jury to reach its conclusions. *Id.*

Accordingly, the Court finds that Mr. Bradley fails to demonstrate the "extraordinary circumstances" required to grant a motion for a new trial based on the arguments raised in their motions for acquittal. *Ferguson*, 246 F.3d at 134 ("[C]ourts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," only intruding in "exceptional circumstances," such as when "testimony is 'patently incredible or defies physical realities.'") (citation and internal marks omitted).

## IV. CONCLUSION

For the foregoing reasons, Mr. Bradley's motion for acquittal is **GRANTED in part and DENIED in part** and his motion for a new trial is **DENIED**.

The motion for acquittal is granted with respect to Counts Three, Four, and Six, and denied with respect to Counts One, Two, and Five.

**SO ORDERED** at New Haven, Connecticut, this 4th day of September, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE